District Court below imposed an unreasonable sentence, because it unreasonably weighed the factors relevant to Mr. Bollinger's sentencing. Okay, you're a soft-spoken fellow, which is okay, but if you could... Is this better? That helps some. You can also adjust the podium if it isn't right. It looks like it's pretty close for you, but if you wanted to go up or down... We'll give this a try. That's helpful. Good. The District Court below imposed a substantively unreasonable sentence, because it unreasonably weighed the factors relevant to Mr. Bollinger's sentencing. In particular, it gave too great weight to one factor in particular, the USSG Section 2D1.1A2's base offense level of 38, which did not apply in this case. The District Court's comments below, the unwarrantedly disparate sentence it imposed on Mr. Bollinger relative to sentences imposed on similar offenders convicted of similar offenses, and the extraordinary departure that it imposed without justification, all evidenced the error that the Court committed. This Court should reverse that case, reverse the error, and correct it. The Court below had several factors to consider. Among them, the appropriate guideline range, an offense level of 10, a criminal history category of 1, and an advisory guideline range of 6 to 12 months. The 5K2.1 factors listed in the guideline departure chapter, the case comparisons provided by Mr. Bollinger, which included the offense facts, offender facts, criminal history calculations, guideline calculations, and departure analyses of the several cases included in the sentencing memorandum. The Court also had before it the USSG Section 2D1.1A2's base offense level of 38, which it elected on its own to consider. It was within this Court's discretion to consider each and every one of these factors. And in fact, in two cases submitted by Mr. Bollinger, those same factors were considered by courts in cases that were relevant. In particular, Noson and Grover. Let me ask you a question, counsel, before you begin another case. Is this Court in November issued the McElderry case? I bet it is. McElderry case? McElderry. Okay, McElderry. Possibly. Maybe. McElderry case. Are you familiar with it? No. Okay, because it says generally that other judges' decisions on sentencing aren't particularly relevant. Well, that would strike me as peculiar for a couple of reasons. Okay. The text of 18 U.S.C. Section 3553A6 specifically says that courts must take into consideration unwarranted sentencing disparity. In Gall v. United States, the Supreme Court approved a sentence imposed where the court looked at intracase disparity. That is, the facts relevant to Mr. Gall, relevant to other offenders in the same conspiracy, and approved a probationary sentence because the facts were different. It would have been unwarrantedly disparate to sentence Mr. Gall to the same sentences other offenders. And, in fact, so between the text of 18 U.S.C. 3553A6 and the case of Gall, I would suggest that how would the court look at unwarranted disparity if you can't look at other cases? And, in fact, let me go back to a case cited in my brief, Dodevich. So Dodevich is a case from this court. Dodevich involved a police officer charged with a civil rights violation. This case reversed the sentence that was imposed because it found the sentence to be unreasonable based on the weight that the court below gave to various factors. In Dodevich, this case relied on an 11th Circuit case called Iray. Iray is a very lengthy opinion that came from the 11th Circuit en banc. There, the 11th Circuit reversed a lower court case because the sentence imposed was substantively unreasonable. A primary feature of the Iray case was a close case comparison of the facts involved in various cases and the facts involved in the case of Iray below. One way in which the 11th Circuit demonstrated the unreasonableness of the sentence imposed below was through the case comparisons included in the Iray opinion. There must have been 11 cases that were included in the Iray opinion to make that comparison. I gave to Judge Jackson, who's since retired, seven or eight cases that made close factual comparisons. Those comparisons included criminal history categories, guideline analyses, departure analyses, offender facts, and offense facts for each and every case that was included in the memorandum. Let me ask you this. I understand you've made that point in your brief, too, and you've given us all these examples. Right. But I thought aside from your case comparisons, you also had some quarrels with the basic logic of the judge in this case. Because you said it seemed to imply the judge relied on some improper factors. For example, you argue about the asthma condition. And then I think you were complaining that the judge treated this fellow more harshly because he was a friend of the deceased. And you seemed to argue that that doesn't make sense because a commercial drug dealer would be treated less harshly than a friend of the deceased. Let me say this. Do I understand that correctly, or can you speak to that? Well, I think that's somewhat less significant than a different point I'd like to make right now, which also relates to the unwarranted disparity in this case. I mean, those things I think are true, but they're less significant than one factor, which I think this Court should consider much more closely, if I may. And that is this base offense level of 38. The Court in its own words in the sentencing transcript at pages 122 and 123 said the following. I will depart upward to a base offense level of 38. The base offense level that would apply had you been convicted under Title 21 U.S.C. Section 841b1c. And the Court said, I deem, quote, an appropriate starting point, that base offense level. That's important because where we started in the case was with an advisory guideline range of 6 to 12 months, a base offense level of 10, and a criminal history category of 1. It was appropriate for the Court to consider the cases that I gave to it, though I don't think it gave them much weight. The advisory guideline calculation, Mr. Bollinger, which included that calculation of a criminal history category of 1, an offense level of 10, an advisory guideline range of 6 to 12 months. It was even appropriate for the Court to consider the offense level at U.S.S.G. Section 2D1.1a2, that offense level of 38. As I said, in Nosson and Grover, the Courts looked at that same guideline range. However, the Court gave controlling an overwhelming weight to that base offense level. So if you look at Nosson, where the Court also considered that base offense level, it imposed a sentence of 60 months on a criminal history category 1 offender with an advisory guideline range of 10 to 16 months. And in Grover, where there was a criminal history category 6 offender who had served three prior terms of imprisonment, had amassed 16 criminal history points, trafficked in heroin, middleman multiple deals, went to trial, was convicted. The Court there considered these same factors, including U.S.S.G. Section 2D1.1a2, and imposed a sentence of 120 months, 10 months less than the sentence imposed on Mr. Bollinger for a criminal history category 6 offender who spent three prior terms of imprisonment. Here, the Court looked at that guideline, 2D1.1a2, and gave that completely controlling weight. It was that undue weight, one that's contrasted with the cases that were provided that show that the Court here disregarded and discounted relevant case comparisons, like the comparisons in Array, and instead relied heavily and controllingly on a base offense level that did not apply when it had no other case that did so, when it had before it the appropriate guideline range. The factors at 5K2.1, which did not mark this case as particularly as aggravated, the case comparisons which show the case as unaggravated, that Section 2D1.1a2 applies only in a limited set of circumstances, namely where the offensive conviction listed in the indictment alleges that death resulted, and though the Court had before it no offender facts or offense facts for a single defendant sentenced under Section 2D1.1a2. I'll reserve the remainder of my time. All right, you may do so. Ms. Whistler, we'll hear from you. Good morning. May it please the Court, my name is Serena Miller-Whistler, and it is my privilege to represent the United States in connection with Mr. Bollinger's appeal. I also served as counsel for the government in the district court. Why don't you move the microphone so that- Sure thing. Thank you. Preliminarily, I find it shocking that the bulk of the argument that Mr. Fine just made in connection with this appeal is not included in the appellant's brief. The appellant's brief, rather, argues that the district judge erred in improperly considering three factors, Mr. Stenger, the victim's asthma condition, his use of Vivitrol, an opioid antagonist, and the long friendship shared between Mr. Bollinger and the victim. Yeah. Why don't you address those because I had thought Mr. Fine would discuss them, but they are briefed, so I think it would be helpful if you respond because I did wonder about those points. First of all, Your Honor, to the extent that Mr. Bollinger alleges that any of those factors were inappropriate for the district court to consider, it's crucial to recall that the government moved in this case for an upward departure under Section 5K2.1 and Section 5K2.0 of the United States Sentencing Guidelines. Interestingly, Mr. Bollinger did not contest the propriety of that upward departure. Rather, the only dispute between the parties at the district court was the extent to which the district court could properly depart. Right, but what he's saying is the judge gave me a lot of extra time, and it was in part based on this notion that the asthma condition made the man more vulnerable and because we were buddies, and those are either factually wrong or for some other reason not appropriate. What do you say to that? Certainly the district court did consider those factors, Your Honor. However, Mr. Bollinger would have this court believe that those were the only factors that the district court considered in arriving at this sentence. In fact, not only did the district court consider the asthma condition, the use of Vivitrol, and the long friendship, the district court did so in the context of evaluating the Section 5K2.1 factors, specifically the extent to which the death was intended or knowingly risked. Obviously, and as decided by the district court, the long friendship between these two people and the intimate knowledge that Mr. Bollinger had with regard to the victim's medical vulnerability and specifically his particular vulnerability to overdose is what drove this decision. They were not, however, the only factors. The district court also found that Mr. Bollinger was aware that Mr. Stenger, the victim, had used heroin earlier on the day that he died. Mr. Bollinger was aware that Mr. Stenger, the victim, had been to rehab at least once, if not twice. Mr. Bollinger was aware that Mr. Stenger was taking Vivitrol shots and had been for 8 to 12 months prior to his death. Mr. Bollinger was also aware that prior to beginning the Vivitrol regimen, Mr. Stenger typically used one or two capsules of heroin at a time to get high. But after beginning the Vivitrol protocol, Mr. Stenger began to use four or even five capsules of heroin at a time to overcome the blockade created by Vivitrol. And in Mr. Bollinger's own words during his interview with the police, and Detective Kurt Sullivan testified to this at sentencing, Mr. Bollinger was aware that Mr. Stenger was using dangerous quantities of heroin in an effort to overcome the blockade created by Vivitrol. Mr. Bollinger was also aware, generally... So can you address the asthma and the friendship and why you think those were not inappropriate or improper? Your Honor, the fact that this victim suffered from a condition that left him pulmonarily compromised is certainly relevant to his knowledge or the knowingness of the risk of Mr. Stenger's death. In other words, Mr. Bollinger was aware that Mr. Stenger was sick on the day that he died. Was there any evidence, though, about the asthma contributing to the death? The government's expert did not render any opinion as to whether or not that played a medical role in the victim's death. However, what she did testify to was that Mr. Stenger's breathing would have been compromised by his asthma. She further testified that heroin and opioids in general act as respiratory depressants. In other words, and she testified specifically that a healthy person breathes 16 to 18 times a minute. When someone is suffering from a heroin overdose, their breathing gradually decreases to the point where they actually stop breathing. Someone who already suffers from a pulmonary condition, whose breathing is then suppressed by the ingestion of heroin, certainly one could conclude, as the district court could have, that the asthma resulted in an effect that was greater than what would be suffered by a normal person. Mr. Bollinger was aware that Mr. Stenger suffered from asthma. Mr. Bollinger was aware that Mr. Stenger's breathing was compromised on the day he delivered the heroin. There was extensive testimony about the fact that text messages were exchanged and that Mr. Bollinger had to walk up the driveway and hand the heroin to Mr. Stenger. And importantly, the last three words Mr. Bollinger ever said to his friend were, dude, be careful. Mr. Bollinger was well aware of the dangers of overdose deaths generally. He talked about the fact that he and Mr. Stenger had acquaintances who had overdosed multiple times. He also was aware of the increased danger of overdose based on Vivitrol use. He talked about a specific friend who was on Vivitrol and who had used too much heroin in an effort to overcome that drug and had overdosed as a result. None of the cases that are cited by the defendant in his brief by Mr. Bollinger have those facts. There are no cases that are cited in this brief or anywhere in which there has been such extensive evidence of a defendant's knowing risk of death to the ultimate victim. Mr. Bollinger suggests in his brief that the district court disregarded the cases that he cited. However, the exact opposite is true. The cases that are cited in Mr. Bollinger's brief, he also cited in his sentencing memorandum to the district court and he cited them again during his argument at the time of sentencing. To suggest that the court disregarded those cases is absolutely without merit. The argument he makes today very closely mirrors the argument that he made before the district court. I would also note that of the cases that Mr. Bollinger cites, the vast majority of those cases are not cases that were decided by the circuit court. That is to say they are not binding authority and were not binding authority on the district court. One of the cases he cites, the Grover case, is a district court case out of the Northern District of Iowa and has absolutely no precedential value whatsoever. Only of the two cases that he cites from this circuit, one is the Merrillville case. The Merrillville case, in the government's view, is largely inconsequential. It's 20 years old and it was decided well before Booker, well before Kimbrough, well before Gall, Bonechert, Hill, Evanson, and certainly the case that was decided by this court in November to which one of your honors made reference earlier. The Nossen case, which is cited by both parties and which the district court clearly considered, Mr. Bollinger would have this court believe that simply because the Eighth Circuit affirmed a sentence of 60 months in the Nossen case, that that's the upper limit of a sentence that can be imposed in a case such as this. This court affirmed a 60-month sentence in Nossen and what that tells us is that the 60-month sentence on those facts and on that record was not substantively unreasonable. What Nossen doesn't say is that a sentence above 60 months would have been substantively unreasonable. That simply is not the case. Why do you think this man deserved the extra time that wasn't given in that case, for example? Your Honor, I would suggest to you that it would be difficult, if not impossible, to find a record more complete than the record that Judge Jackson made in her sentence of Mr. Bollinger. I firmly believe that the record that Judge Jackson made with regard to all of the Section 5K2.1 factors more than adequately justifies the departure in this case. I think that Judge Jackson went to great lengths to explain that not only did Mr. Bollinger knowingly risk the death of his friend, that this event required some degree of planning, some degree of preparation. Mr. Bollinger, as the district court noted, went out of his way and made a 60-mile round trip to acquire this heroin for his friend. He certainly was aware that he had every opportunity to decline to provide these drugs to Mr. Stenger. He certainly was aware of the dangers of his conduct. The district court also discussed, Your Honor, the general deterrence that she connected to this sentence. She specifically stated that the general public should know that the distribution of a controlled substance resulting in death will result in severe consequences. It's important to recall that these cases are not decided in a vacuum. And when we look at the degree of the opioid epidemic as it currently exists, not only in this community but many others, that point should not be lost. This is a sentence that was richly deserved based upon the conduct that Mr. Bollinger engaged in on the night that he chose to deliver heroin to his friend who ultimately succumbed to it and was found deceased the following morning. And with that, Your Honors, I thank you for your time and I will submit the matter. Very well. Thank you for your argument. Mr. Fine, we'll hear from you in rebuttal. No two cases are the same. Every case has some factual difference to another case. In every Section 2D1.1A2 case where death results, there is a knowing risk of death to another. One can hardly give heroin to another party and expect that there is not some risk of death. That is the nature of drug addiction and use of hardcore drugs. These were two friends. Mr. Bollinger was not a trafficker in heroin. He sought no profit from this. In this particular case, it was Mr. Stenger who asked Mr. Bollinger to get the heroin for him. Do you think the judge thought that made it worse in a sense? It seems that way. Because Bollinger should have appreciated more that Stenger was vulnerable and could have protected him from the death. Congress expects that drug users and chemical dependents will act irrationally, which is why in Section 922G it makes it unlawful for chemical dependents to possess firearms. We do not expect drug addicts and co-dependent relationships to act irrationally. We expect them to act irrationally. So when a friend helps another to acquire a drug when they're both co-dependents, that makes sense with the internal logic of narcotics addiction. One last quick point, if I may. I see my time is up. One last quick point, yes. Under 5K2.1, the factors, no factor suggested this case was aggravated. The plan and preparation was minimal. He drove for a friend. There was one death, not multiple deaths. No other factor involved suggested his case was aggravated in any way. I would urge the court to look at the cases. Look at the base offense level. Look at pages 122 and 123 of this transcript and the base offense level adopted by the court. I ask the court to reverse this case and remand for resentencing to the district judge who will replace Judge Jackson upon retirement. Thank you. Very well. Thank you for your argument. Thank you, both counsel. The case is submitted, and the court will file an opinion in due course.